**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0441-24

60 CHALLENGER FB, LLC,
a Delaware limited liability
company,

      Plaintiff-Respondent,

v.

CHALLENGER 60, LLC, a
New Jersey limited liability
company, KENNETH STURM,
an individual, JOSH WEINER,
an individual, CHALLENGER
60 SM, LLC, a New Jersey
limited liability company,
STURM ASSET MANAGEMENT
LLC, a New York limited liability
company, CHALLENGER 60
OWNER, LLC, a New Jersey limited
liability company, DESIMONE
CONSULTING ENGINEERING
D.P.C., a New York domestic
professional service corporation,
MG ENGINEERING-NJ CORP.,
a New Jersey corporation, and
THE STATE OF NEW JERSEY,

      Defendants,

and

ZEE BRIDGE CAPITAL, LLC,
a Delaware limited liability
company,

     Defendant-Appellant.

_____

Submitted November 12, 2025 – Decided March 31, 2026

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. F-012714-22.

Fox Rothschild LLP, attorneys for appellant (Barry J. Muller, of counsel and on the briefs).

Wilentz Goldman & Spitzer, attorneys for respondent (David H. Stein, of counsel and on the brief; Benjamin P. Montenegro, on the brief).

PER CURIAM

In this commercial foreclosure action, defendant Zee Bridge Capital, LLC (Zee Bridge) appeals from a September 23, 2024 order fixing the date of default, fixing the amount due on a mortgage, granting default interest, and awarding attorneys' fees[1] to plaintiff, 60 Challenger FB, LLC. Defendant also appeals

_____

[1] Nowhere in its merits brief does Zee Bridge present any legal argument or citation of law challenging the counsel fee award. As a consequence, Zee Bridge

A-0441-24

from a November 27, 2024 final judgment, and a January 7, 2025 order correcting clerical errors in the final judgment. Based on our review of the record and the applicable legal principles, we affirm.

I.

The dispute arises from an action brought by plaintiff to foreclose on a mortgage on a commercial property consisting of an undeveloped mixed-use project located in the Village of Ridgefield Park (Village). Defendant is an undisputed junior lienholder on the mortgage.

Kenneth Sturm is a manager and part owner of Challenger 60, LLC (Challenger 60). In 2018, Challenger 60 entered into a contract to purchase Block 24.04, Lot 1, and Block 24.05, Lot 1 (the Property) from the Village. The contemplated use of the Property was the construction of a nineteen-story mixed-use tower with 552 residential units and 14,000 square feet of commercial space.

Following a settlement agreement, the Chancery Division issued a June 11, 2020 order and November 14, 2020 final judgment in favor of Gated

---

has effectively waived this argument on appeal. See N.J. Dep't of Env't. Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n. 2 (App. Div. 2015); El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 155 n.2 (App. Div. 2005) (citing In re Certification of Need of Bloomingdale Convalescent Ctr., 233 N.J. Super. 46, 48 n.1 (App. Div. 1989)).

Investments Woodbridge, LLC (Gated), Zee Bridge's predecessor in interest, and against Sturm and several entities in which he held an ownership interest. Pursuant to a December 18, 2020 order, Challenger 60 was required to satisfy the judgments out of the proceeds of a loan it was obtaining to, in part, purchase the Property.

The parties' contract to purchase the Property required Challenger 60 to close on the Property by December 31, 2020; otherwise, it would forfeit deposit monies to the Village. However, on December 31, 2020, Challenger 60 did not have sufficient funds to both fully satisfy Gated's judgments, and purchase the Property. Because Gated's judgments had to be satisfied and discharged as a prerequisite for Challenger 60 to obtain the financing from the lenders necessary for the purchase of the Property, Gated agreed to the satisfaction of the judgments if Challenger 60 executed a note making Gated a subordinate lender, with Challenger 60's debt secured by a subordinate mortgage on the Property.

As a result, the lenders entered into a one-year loan agreement (the Loan Agreement or First Loan) with Challenger 60 on December 31, 2020, for a principal sum of $10,550,000. MTAG Investments, LLC (MTAG), plaintiff's predecessor in interest, functioned as an administrative and collateral agent for Edisto Loan Fund, LLC, Metropolitan Partners Fund VI, LP, and Metropolitan

4

Partners Fund VI (3c1), LP (collectively, the Original Lenders). The Loan Agreement stated that each of the Original Lenders could receive a separate promissory note from Challenger 60 to evidence Challenger 60's indebtedness. The loan successfully financed the purchase of the Property.

The Loan Agreement contemplated interest payments would be made by Challenger 60 on the first day of each month, commencing with an initial payment due on December 31, 2020, until the maturity date of December 31, 2021, at which time all unpaid principal, accrued and unpaid interest, and all other amounts due on the Loan Agreement would be due and payable in full unless earlier accelerated. As set forth in the Loan Agreement, the maturity date could be extended. The Loan Agreement also provided for an interest rate of 12.50% per annum (Standard Rate), compounded daily, and a default interest rate (Default Rate) of the Standard Rate plus 8.5% per annum, "but in no event more than the highest rate permitted by applicable usury law."

Plaintiff's managing member, Steve Wissak, later certified that the "terms and conditions of the Loan [Agreement]" were "consistent with industry standards for other short-term facilities of this type." The lenders and Challenger 60 executed the Loan Agreement, and Sturm, Challenger 60 SM (SM), Sturm Asset Management LLC (SAM), and Josh Weiner (collectively

A-0441-24

Guarantors) executed guaranty agreements in which they guaranteed payment and performance by Challenger 60. Challenger 60 and the guarantors were represented by counsel in the loan transaction.

To secure the promissory notes and debt, on December 31, 2020, Challenger 60 executed a mortgage in favor of MTAG for the Original Lenders in the original principal amount of $10,550,000 (the MTAG Mortgage or Mortgage) encumbering, without limitation, real property and improvements located at the Property. The MTAG Mortgage was recorded on March 5, 2021, in the Bergen County Clerk's Office as Instrument 2021031151 in Book 3996, Page 1820.

The Mortgage and all of MTAG's rights, title, and interest of any kind were subsequently assigned to Metropolitan Partners Group Administration, LLC (MPGA) by virtue of an assignment of mortgage dated January 4, 2021, and recorded on April 12, 2021, in the Bergen County Clerk's Office as instrument number 2021054278 in Book 4070, Page 1683.

Shortly after the loan was issued, Challenger 60 failed to make the required payments. On March 12, 2021, Challenger 60 and the Guarantors executed a forbearance agreement (the First Forbearance Agreement), in which Challenger 60 and the Guarantors unconditionally acknowledged, agreed, and

6

confirmed that Challenger 60 was in default of the Loan Agreement. The First Forbearance Agreement also provided that all indebtedness would continue to bear interest at the Default Rate; however, if Challenger 60 complied with all terms and conditions of the First Forbearance Agreement and no new events of default occurred, the interest rate would revert to the original interest rate, retroactive to the date of the first existing default.

On or about December 31, 2021, Challenger 60 and the Guarantors executed a second forbearance agreement (the Second Forbearance Agreement), in which Challenger 60 and the Guarantors unconditionally acknowledged, agreed, and confirmed that, once again, Challenger 60 was in default of the Loan Agreement. The Second Forbearance Agreement also provided that all indebtedness would continue to bear interest at the Default Rate; however, if Challenger 60 complied with all terms and conditions of the Second Forbearance Agreement and no new events of default occurred, the interest rate would revert to the original interest rate, retroactive to the date of the second default.

On or about February 1, 2022, Challenger 60 and the Guarantors executed a third forbearance agreement (the Third Forbearance Agreement and, collectively with the First and Second Forbearance Agreements, the Forbearance Agreements). Once again, Challenger 60 and the Guarantors unconditionally

7

acknowledged, agreed, and confirmed that Challenger 60 was in default under the Loan Agreement. The Third Forbearance Agreement provided that all indebtedness would continue to bear interest at the Default Rate; however, if no new events of default occurred and if Challenger 60 complied with all terms and conditions and repaid the indebtedness in full by March 31, 2022, the interest rate would revert to the original interest rate, retroactive to September 30, 2021.

The Mortgage and MPGA's rights, title, and interest of any kind were subsequently assigned by MPGA to plaintiff by virtue of an assignment of mortgage, dated April 6, 2022, and recorded on July 6, 2022, in the Bergen County Clerk's Office as instrument number 2022067889 in Book 4733, Page 1671. Plaintiff apparently acquired the interest using an intermediary or broker, Lawrence Selevan, Chief Executive Officer of Chesterfield Faring Ltd. (Chesterfield). Chesterfield paid MTAG between $10.3 and $10.5 million via wire transfer on April 6 or 7, 2022, with 60 Challenger Debt LLC (Debt LLC), an entity solely owned by Selevan, temporarily acquiring the First Loan and Mortgage.

In connection with the payment, a payoff statement (April 7 Payoff Statement) was created on MTAG letterhead stating that the "total amount due" on the First Loan as of April 7, 2022, was $10,317,328.13. The statement

indicated there was no interest due on the loan and there was an escrow balance of $157,662.87 in Challenger 60's favor. However, the statement also represented that if the funds were received after April 7, there could be "ADDITIONAL INTEREST DUE AND PAYABLE." By virtue of the April 6, 2022 assignment of mortgage and related documents, plaintiff eventually became and remains the owner and holder of the First Loan and Mortgage and has possession of the loan documents and standing to enforce them.

Contemporaneously with the April 7 Payoff Statement, a document dated April 7, 2022 (Amendment to Loan Agreement), was signed by Selevan alone. In consideration of $10, the Amendment to Loan Agreement purported to amend the Loan Agreement to make January 7, 2023, the maturity date. It also stated the First Loan had a principal balance of $13,586,626, partly "comprised of . . . the $10,550,000[] initial [l]oan" and "$1,936,094 agreed interest thereon at the [i]nterest [r]ate."

Simultaneously with the First Loan closing in December 2020, Challenger 60 executed a note and second mortgage in favor of Gated (the Second Loan), in which Challenger 60 promised to pay Gated $4 million with interest. The Second Loan would mature on December 31, 2021. Gated also entered into a subordination and standstill agreement with MTAG on December 31, 2020 (the

Subordination Agreement), which recognized MTAG's loan and Mortgage would have contractual priority over Gated's loan. In consideration for agreeing to the priority of MTAG, the Subordination Agreement granted Gated the right to purchase and obtain an assignment of the MTAG Loan at the amount due upon the commencement of any "[e]nforcement [a]ction" by the senior lenders in the event of a default. The Subordination Agreement also provided that the senior lenders would "provide . . . [Gated] . . . a copy of any written notice to the [b]orrower of any default declared by [the] [senior lenders] under the First Loan . . . within ten . . . days[] after providing such notice to the [b]orrower."

On December 31, 2021, payment became due and owing to Gated. However, Challenger 60 failed to make payment to Gated, thereby defaulting on the Second Loan. On January 18, 2022, Gated filed a mortgage foreclosure complaint.

On February 23, 2022, Gated requested the payoff amount of the First Loan to pay off the loan and develop the Property upon completion of foreclosure of the Second Loan. MTAG instructed Gated to contact Glen Fishman, an agent of MTAG, to discuss the potential purchase of the First Loan. On February 28, 2022, Gated's Charlie Avery contacted Fishman via telephone. Fishman advised Avery that MTAG had provided Challenger 60 with a

forbearance on the First Loan and that as of April 1, 2022, the MTAG Loan "would be for sale at 'par.'" He further stated MTAG's attorney would be contacting Gated to discuss a sale. However, on or about April 6, 2022, MTAG sold the First Loan to plaintiff and MPGA assigned the senior interest to plaintiff.

On April 8, 2022, Challenger 60 and the Guarantors executed a borrower estoppel agreement (Borrower Estoppel) with plaintiff. The agreement acknowledged the outstanding principal balance of the First Loan was $10,550,000 and that "interest at the Default Rate ha[d] accrued since January 1, 2022[,] and continue[d] to accrue." The agreement also acknowledged and confirmed the validity and effect of a schedule of documents, including the First Loan and Mortgage and the Forbearance Agreements.

On the same date, MTAG notified Gated it had sold its loan to plaintiff and that plaintiff would be contacting Gated. The following day, April 9, 2022, Selevan sent a draft email to Sturm and various other parties, including attorneys of the firm representing plaintiff in the assignment transaction. The email contained Selevan's "initial salvo" to Gated, which conveyed the payoff amount as of April 8, 2022, as $12,298,705.83. The offer gave Gated seven business days to accept. Following the proposed offer, Selevan wrote,

11

> They always have the right to make us an offer. We can always change our mind regarding selling our loan. The message is we are mercenary and do not care how we make our money. A message that they are f[***]ed.

On April 11, 2022, Selevan emailed Gated on plaintiff's behalf with an offer pursuant to the Subordination Agreement to purchase the MTAG Loan for the "payoff amount" of $12,298,705.83 for the First Loan. Selevan represented to Gated that this was the outstanding amount owed on the MTAG Loan and gave Gated seven business days to accept or reject the offer. The email was similar to his draft "initial salvo." Copied on the email was plaintiff's counsel at the time. Selevan concluded by stating, "Please respond to both legal counsel(s) of record (cc attached) to this email and all future correspondence that you and I have directly."

A closing statement dated April 5, 2022 (April 5 Payoff Statement), was provided to Gated reflecting the $12,298,705.83 figure, comprised of: (1) the full principal amount of the First Loan; (2) $584,646.83 of interest incurred at the Default Rate from January 1, 2022, to April 5, 2022; (3) $721,883 of interest at the Standard Rate; (4) a $230,850 exit fee as per the Loan Agreement; and (5) a $211,327 extension fee as per the Loan Agreement. Counsel for Gated, Barry

Muller,[2] replied on the same day that Gated could not "evaluate any offer until [it was] provided [with] a copy of the documents from the MTAG transaction, which [it was] entitled to under the terms of the Subordination Agreement." Muller requested Selevan to "provide . . . the documents ASAP."

Gated maintains Selevan and plaintiff never provided any documents other than the April 5 Payoff Statement. Instead, Challenger 60 later provided the April 7 Payoff Statement during discovery of plaintiff's foreclosure matter. Accordingly, Gated declared a breach of the Subordination Agreement on April 13, 2022, and Muller emailed Selevan and plaintiff's counsel that Zee Bridge would be "sending out [s]ubpoenas to everyone." Muller also declared a "formal litigation hold and demand for preservation of all electronically stored information."

On April 14, 2022, a SAM employee emailed Selevan and others asking for the closing statement for the transaction. Selevan replied, "With [Muller] threatening to subpoena[,] a no[-]go on sending that." Upon the employee's insistence, Selevan stated, "Eventually[,] but I do not want it used against you. We simply bought the existing loan for $10,550,000." When the employee again

---

[2] Muller later represented Zee Bridge in this matter and continues to do so on appeal.

A-0441-24

objected, Selevan reiterated, "I[t] i[s] not a new loan. We merely bought the existing loan, [and] my closing statement is between [plaintiff] and [C]hesterfield. I can send [the] final from MTAG."

On June 2, 2022, Gated obtained a final judgment in its foreclosure action against Challenger 60 and obtained a writ of execution on the Property. Several Sheriff's sales for the Property were scheduled and postponed. Challenger 60 utilized all its statutory adjournments until a final sale date was scheduled for December 2, 2022.

In October 2022, Sturm requested Zee Bridge's help to save the Property from the foreclosure sale and to provide additional short-term financing to enable Challenger 60 to either obtain a construction loan to develop the Project or sell it to a developer. Sturm assured Zee Bridge both orally and in writing that the MTAG Loan remained current. Sturm also testified in an August 31, 2022 deposition that the First Loan was not in default at that time. Further, as of October 2022, MTAG had not filed an action against Challenger 60 for default or foreclosure.

On October 21, 2022, Zee Bridge paid Gated $5.1 million for an assignment of Gated's foreclosure judgment to stop the pending foreclosure sale.

A-0441-24

Zee Bridge provided Challenger 60 with additional short-term financing in the principal amount of $1,650,000.

Plaintiff then filed the instant foreclosure action on November 22, 2022, claiming the MTAG Loan had been in default since January 1, 2022, and seeking to foreclose on the Property. On or about April 27, 2023, plaintiff filed a first amended complaint, and on May 15, 2023, Zee Bridge filed a contesting answer with affirmative defenses. Zee Bridge's affirmative defenses included the doctrine of unclean hands and breach of the implied covenant of good faith and fair dealing. Sturm, SM, and SAM also filed an answer and separate affirmative defenses on June 2, 2023.

On December 1, 2023, the trial court entered an order granting plaintiff summary judgment to move forward with its foreclosure on the Property, establishing the priority of the First Loan and Mortgage, and striking Zee Bridge's affirmative defenses. In an accompanying statement of reasons, the judge delineated the uncontested material facts, the governing legal principles, and his conclusions of law.

Pertinent to the issues raised in this appeal, the judge stated:

> Zee [Bridge] separately argues that Gated['s] . . . foreclosure judgment has priority over [p]laintiff's [m]ortgage. There is no dispute that a [s]ubordination [a]greement exists between MTAG . . . and Gated . . . ,

> or that Zee [Bridge] is the assignee of Gated['s] . . . foreclosure judgment[,] which is subject to the Subordination Agreement. The only dispute is . . . whether [p]laintiff has breached it. But Zee [Bridge] fails to identify which provision of the Subordination Agreement [p]laintiff purportedly breached or any provision which would cause loss of priority upon breach. Accordingly, the [c]ourt finds that Zee[ Bridge's] argument is without merit.

The judge also found arguments "surrounding the calculation of the amount due" were "premature" and deferred determination of the amount due on the First Loan until entry of final judgment.

On April 26, 2024, plaintiff moved for entry of an order fixing the date of default, fixing the amount due on the First Loan and Mortgage, granting default interest, and awarding attorneys' fees. In support, plaintiff attached a certification by Wissak, affidavits of legal services, and documentary evidence, including the Loan Agreement and First Mortgage, Forbearance Agreements, Oand Borrower Estoppel, as well as a certification of amount due. In opposition, Zee Bridge filed certifications and affidavits by Muller, Sturm, and Lawrence Linksman, the managing member of Zee Bridge. Zee Bridge also provided extensive documentary evidence, including the Subordination Agreement, emails between the parties, partially executed Amendment to Loan Agreement, April 5 and April 7 Payoff Statements, and interest computation.

Following oral argument, on September 23, 2024, the judge issued an order fixing the date of default as January 1, 2022, fixing the amount due on the First Mortgage as $15,591,111.26, granting default interest to be fully calculated upon entry of final judgment of foreclosure, and awarding attorneys' fees in the amount of $124,929.50. In an accompanying written opinion, addressing the default date, the judge stated:

> Plaintiff requests that the court fix January 1, 2022, as the date of default. The Loan Agreement required [the b]orrower to repay the loan by December 31, 2021. It is undisputed that [the b]orrower failed to meet this deadline. [The b]orrower asserts that a purported Amendment to Loan Agreement modified the maturity date and that the date of [d]efault should be April 8, 2022. Borrower further asserts that a payoff statement good through April 7, 2022, indicated that no interest or fees were due, suggesting that the loan was not . . . in default at that time. But the court finds that [p]laintiff's predecessor, MTAG, did not issue this payoff statement in connection with the satisfaction of the loan. Instead, MTAG issued this payoff statement in connection with the sale of the loan to [p]laintiff. It is not relevant to the court's determination. Further, the court finds that [p]laintiff never signed the purported Amendment to Loan Agreement and that it is not enforceable. What is enforceable, however, is the Borrower Estoppel . . . [and] [t]he three Forbearance Agreements . . . . In these agreements[,] [the b]orrower again acknowledges that [e]vents of [d]efault have occurred with the First Forbearance Agreement dated as early as . . . March 12, 2021. Borrower's argument is without merit.

> Zee Bridge takes issue with . . . [the April 5 Payoff] Statement. This statement was good through April 8, 2022, and revealed an amount due of $12,298,705.83. . . . Zee Bridge asserts that [p]laintiff intentionally misrepresented the amount due under its loan to prevent Gated . . . from paying off the [F]irst [L]oan. However[,] the court finds this argument unpersuasive. Plaintiff had the right to sell its loan to whomever it wanted at whatever price it preferred. It did not have to choose face value. It did not have to sell the loan at par . . . [or] at the same price . . . it acquired it. Instead, [p]laintiff exercised its discretion and demanded $12,298,705.83. That is [p]laintiff's prerogative. The court does not have to reconcile the discrepancies between the MTAG [payoff] statements. They do not impact the default date. That date is controlled by the Loan Agreement, the Borrower Estoppel[,] and the Forbearance Agreements.

In addressing the reasonableness of the default interest rate, the judge cited Metlife Capital Financial Corp. v. Washington Avenue Associates, L.P., 159 N.J. 484, 495, 501 (1999), for the proposition that "stipulated default rate provisions are presumptively reasonable" in commercial transactions between sophisticated parties as here. The judge pointed out plaintiff had certified that a default rate of 21% was "standard in the industry" and defendant had failed to present any evidence that "the interest rate was not fairly negotiated or that it does not comply with industry standards," despite having the burden to do so. Accordingly, the judge found the rate reasonable and awarded plaintiff interest at that rate.

A-0441-24

On or about November 7, 2024, plaintiff moved for final judgment, supported by a certification of the amount due as of October 29, 2024, and other documentary evidence. On November 27, 2024, the judge entered final judgment. The judgment provided plaintiff was entitled to "$15,591,111.25 with contract interest of 21% on $15,591,111.25 from [April 1, 2024,] to November 27, 2024[,] and lawful interest thereafter" along with attorneys' fees. On or about January 3, 2025, plaintiff moved to correct a clerical error in the final judgment. In support, plaintiff submitted exhibits and a certification. On January 7, 2025, the judge issued an order adopting plaintiff's proposed order and amended writ of execution, which clarified that the default interest should be calculated using the principal amount of the First Loan, not the principal plus accrued interest. This appeal followed.

On appeal, defendant generally argues the judge erred in awarding plaintiff nearly $5 million in default interest and in determining that January 1, 2022, was the date of default under the MTAG loan.

II.

We begin by setting out the guideposts that inform our review. We review a trial court's summary judgment ruling "de novo under the same standard as the

trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, 142 N.J. at 540.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations reformatted).]

Where there is no material fact in dispute, we "must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007), overruled on other grounds by Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558 (2012)). We "review issues of law de novo and accord no deference to the trial judge's [legal] conclusions." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

If there are no material facts in dispute, we interpret contract terms de novo. Serico v. Rothberg, 234 N.J. 168, 178 (2018). However, "[w]hether

20

conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." Mango v. Pierce-Coombs, 370 N.J. Super. 239, 257 (App. Div. 2004).

On the other hand, we review the denial of equitable remedies for an abuse of discretion. See Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993) (concluding "the trial court did not abuse its discretion in its balancing of the equities and its formulation of an appropriate remedy"); see also Kaye v. Rosefielde, 223 N.J. 218, 231 (2015) (noting a chancery judge has broad discretionary power to adapt equitable remedies to the particular circumstances of a case). This includes a trial court's decision on whether to apply the doctrine of unclean hands. Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001). Additionally, in general, "an application to open, vacate[,] or otherwise set aside a foreclosure judgment or proceedings subsequent thereto is subject to an abuse of discretion standard." United States v. Scurry, 193 N.J. 492, 502 (2008). "A court abuses its discretion 'when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Parke Bank v. Voorhees Diner Corp., 480 N.J. Super. 254, 262 (App. Div. 2024) (quoting Mims v. City of Gloucester, 479 N.J. Super. 1, 5 (App. Div. 2024)).

Zee Bridge does not dispute plaintiff's ability to foreclose on the property[3] or plaintiff's senior status as a lienholder. Instead, Zee Bridge argues the judge erred in fixing the date of default by relying "entirely upon the April 8, 2022 Borrower Estoppel," which "was a sham and did not accurately reflect the true status" of the loan. Zee Bridge argues the true payoff amount of the loan was reflected in the April 7 Payoff Statement between plaintiff and MTAG. Zee Bridge further asserts Selevan had "apparent authority to act on [p]laintiff's behalf" and his actions render the date of default a disputed material fact "which c[an] only be resolved through an evidentiary hearing."

Loan agreements and written agreements modifying them are contracts subject to traditional principles of contract interpretation. See Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp., 276 N.J. Super. 163, 172-75 (App. Div. 1994). "It is well-settled that '[c]ourts enforce contracts "based on the intent of

---

[3] On the other hand, plaintiff asserts Zee Bridge "lacks standing or other legal basis" to challenge the foreclosure action. Plaintiff asserts even if Zee Bridge had standing, its right to raise these issues was "extinguished" by the judge's dismissal of its answer and affirmative defenses, which it is not appealing. Because plaintiff failed to raise this issue in the trial court and the issue does not go to the trial court's jurisdiction or implicate a matter of public interest, we do not address plaintiff's objection. See Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 79 (App. Div. 2001) ("As a general rule, an appellate court will not consider matters not properly raised below, unless the issue goes to the jurisdiction of the trial court or substantially implicates a matter of public interest." (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973))).

the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract."'" In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (alteration in original) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)).

Contracts are read as a whole, and their terms are given their "plain, ordinary meaning" if "clear and unambiguous." C.L. v. Div. of Med. Assistance & Health Servs., 473 N.J. Super. 591, 599 (App. Div. 2022) (first quoting Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 270 (2008); and then quoting Watson v. City of E. Orange, 175 N.J. 442, 447 (2003) (Long, J., dissenting)). Further, a creditor possesses the right to "declare a loan in default or to forbear from taking such action" conditioned upon a debtor "agreeing to certain modifications in the agreement." Glenfed, 276 N.J. Super. at 174.

A fraud on the court occurs "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Triffin v. Automatic Data Processing, Inc., 411 N.J. Super. 292, 298 (App. Div. 2010) (quoting Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 251 (App. Div.

23

2007)).  Although reliance is not required, ibid., "[f]raud is not presumed," and "must be proven through clear and convincing evidence."  Stoecker v. Echevarria, 408 N.J. Super. 597, 617-18 (App. Div. 2009) (quoting Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989)).

Here, in determining the date of default, the judge considered the Loan Agreement, Forbearance Agreements, Borrower Estoppel, Amendment to Loan Agreement, and the April 5 and 7 Payoff Statements.  The judge correctly found the Forbearance Agreements and the Borrower Estoppel clearly established multiple events of default had occurred.

The First Forbearance Agreement listed several events of default, including Challenger 60's "failure to provide, within five business days[] after the [e]ffective [d]ate, an environmental insurance policy covering the . . . Property."  The agreement was signed by Challenger 60 and the Guarantors, with the exception of Weiner.  The agreement stated Challenger 60 and the Guarantors "unconditionally acknowledge" Challenger 60 was "in default" and the debt was continuing

> to bear interest at the Default Rate; provided that if [Challenger 60] complies with all [the First Forbearance Agreement's terms] . . . and no new [e]vents of [d]efault have occurred, the interest rate shall revert to the [Standard Rate] . . . retroactive to the date of the first . . . [d]efault.

[(Emphasis omitted).]

Challenger 60 failed to meet these terms.

The Second Forbearance Agreement, which was signed by Challenger 60 and all Guarantors, again acknowledged events of default had occurred. The same is true of the Third Forbearance Agreement, which confirmed the loan's principal balance remained at $10,550,000 and interest continued to accrue at the Default Rate. The lenders agreed to "forbear in exercising the rights and remedies . . . available to the[m]" under the Loan Agreement, common law, or equity principles because of the defaults until March 31, 2022. Had Challenger 60 complied with the terms of the agreement by that new forbearance termination date, interest would have reverted to the Standard Rate retroactive to September 30, 2021. As the default continued past March 31, 2022, however, Challenger 60 did not satisfy these terms.

The April 8, 2022 Borrower Estoppel, signed by Challenger 60 and the Guarantors, reiterated the principal balance and noted "interest at the Default Rate has accrued since January 1, 2022, and continues to accrue." It also affirmed the validity of the Loan Agreement and the Forbearance Agreements. It is undisputed that the documents were fully executed and binding upon the senior lenders, Challenger 60, and the Guarantors. Thus, we agree with the

25

judge that the documents are valid and enforceable modifications of the Loan Agreement. Glenfed, 276 N.J. Super. at 174.

On this record, Zee Bridge's contention that the Borrower Estoppel is a "sham" based on the April 7 Payoff Statement and Sturm's representations is unpersuasive. Sturm's statements that he did not believe the loan was in default holds little weight as he signed the Borrower Estoppel on April 8, 2022, confirming interest continued to accrue at the Default Rate.

Zee Bridge also claims the April 5 Payoff Statement on MTAG letterhead is evidence of plaintiff's fraud since that statement was prepared by plaintiff instead of MTAG. Zee Bridge's claim is unsupported by the record. See Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) ("Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" (quoting Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 425-26 (App. Div. 2009))).

An assignment is effective on the date of execution. See EMC Mortg. Corp. v. Chaudhri, 400 N.J. Super. 126, 141 (App. Div. 2008) ("[T]hat assignments of mortgages may be recorded does not affect the validity of an assignment of a mortgage which has not been recorded." (quoting In re Kennedy Mortg. Co., 17 B.R. 957, 964 (Bankr. D.N.J. 1982))). However, an assignment

passes no interest where the mortgage and assignment have not yet been delivered to the assignee. Rose v. Kimball, 16 N.J. Eq. 185, 186-88 (Ch. 1863); see also Al-Sco Realty Co. v. Suburban Apt. Corp., 141 N.J. Eq. 40, 40-42 (E. & A. 1947) (affirming trial court's order to execute and deliver assignment of leasehold to effectuate assignment).

If the mortgage had not yet been assigned to plaintiff, the loan holder at the time, MPGA, would have been required to sign the Amendment to Loan Agreement pursuant to the Loan Agreement's terms. Because the assignment of mortgage lists a delivery date of April 8, 2022, this is the date plaintiff acquired the loan. Zee Bridge does not maintain that Selevan was acting on behalf of MPGA, and there is no evidence in the record that he had authority as MPGA's agent. It is doubtful Zee Bridge could do so anyway because Zee Bridge would be asserting third-party standing for Challenger 60's claim of reliance. See Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 24-27 (App. Div. 2021) (noting parties arguing apparent authority must demonstrate they reasonably relied upon the principal's representation of authority). Because the April 7, 2022 Loan Amendment Agreement signed by Selevan and relied upon by Zee Bridge was unenforceable, we agree with the judge that the Loan

Agreement, the Borrower Estoppel, and the Forbearance Agreements control the default date.

Next, Zee Bridge argues the judge erred in awarding plaintiff default interest without an evidentiary hearing considering both the loan documents and the equitable doctrine of unclean hands. Zee Bridge asserts the judge erred in stating plaintiff "could sell the loan at whatever price it 'preferred,'" thereby disregarding the Subordination Agreement, which required plaintiff to purchase the loan "at the amount due" at that time. Zee Bridge also points to plaintiff's April 11, 2022 representation that the "payoff" amount was $12,298,705.83. Zee Bridge contends plaintiff "expressly represented that it was offering Gated the opportunity to purchase the . . . [l]oan pursuant to the terms" of the Subordination Agreement.

Section 8 of the Subordination Agreement reads as follows:

> Notice of Default. First [l]ender agrees to provide to [s]ubordinate [l]ender (i) a copy of any written notice to the [b]orrower of any default declared by the [f]irst [l]ender under the [f]irst [l]oan [d]ocuments, within ten . . . days[] after providing such notice to the [b]orrower, and (ii) notice of any actions it takes under paragraphs (c) or (d) of [section 3 of this Subordination Agreement] . . . . Any time after [f]irst [l]ender commences any [e]nforcement [a]ction, [s]ubordinate [l]ender shall have the right to purchase and take an assignment of the . . . [f]irst [l]oan [d]ocuments for a purchase price equal to the then outstanding aggregate

28

principal amount of the [f]irst [n]ote plus all other obligations then due under the [f]irst [l]oan [d]ocuments including, but not limited to, interest (including at the default rate), any protective advances, [and] costs and expenses . . . .

We acknowledge that contrary to the judge's statement, the language in the Subordination Agreement makes it clear that Gated, as Zee Bridge's predecessor in interest, would be able to purchase the loan for the outstanding principal amount plus all interest due, not whatever amount plaintiff wanted. Nevertheless, the error does not affect the validity of the judge's award of default interest. See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (holding reviewing courts "are free to affirm the trial court's decision on grounds different from those relied upon by the trial court"). Instead, the Loan Agreement, the Borrower Estoppel, and the Forbearance Agreements establish plaintiff's right to default interest.

Zee Bridge maintains plaintiff lost its contractual right to default interest through its breach of the implied covenant of good faith and fair dealing. Specifically, Zee Bridge argues plaintiff: (1) "misrepresent[ed] the payoff amount by nearly $2 million"; and (2) created a "series of sham, conflicting documents," including the Borrower Estoppel and the April 5 Payoff Statement, that falsely represented the loan "had been in default for an extended period of

A-0441-24

time" and added "bogus charges." Zee Bridge claims if plaintiff had properly represented the payoff amount, Gated would have purchased the loan and "$5 million in additional interest would not have accrued."

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). The covenant requires a party to not "do anything which [would] have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 245 (quoting Sons of Thunder v. Borden, Inc., 148 N.J. 396, 421 (1997)). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." Id. at 244.

We reject Zee Bridge's contention that plaintiff breached the implied covenant of good faith and fair dealing. First, Zee Bridge presents no competent evidence to support its argument that the Borrower Estoppel was fraudulent. The Borrower Estoppel was fully executed by Challenger 60 and the Guarantors. Further, the Forbearance Agreements also established that the loan was in default prior to 2022. Consequently, the creation and execution of the Borrower Estoppel does not support a finding of breach.

30

Similarly, the payoff statements do not evidence plaintiff's denial of Zee Bridge's right to the benefits of the contract. Although the April 7 Payoff Statement for $10,317,328.13 on MTAG letterhead is suspicious, it does not prove the First Loan was not in default as of April 2022. As the judge explained, "MTAG issued this payoff statement in connection with the sale of the loan to [p]laintiff"; it was "not issue[d] . . . in connection with the satisfaction of the loan."

Because the judge correctly set the date of default as January 1, 2022, plaintiff complied with the Subordination Agreement by making the April 11, 2022 offer of $12,298,705.83 with the closing statement. The amount constituted the principal amount of the loan, interest at the Default Rate from January 1 to April 5, 2022, current interest at the Standard Rate, and exit and extension fees. Default interest was specifically contemplated and authorized by the loan documents, and it follows that Gated would have had to pay the exit fee instead of Challenger 60 if it fully satisfied the loan to acquire the assignment. Even assuming the $211,327 extension fee was "bogus," as Zee Bridge claims, Gated was not deprived of its right to purchase under the Subordination Agreement. Gated retained the right to purchase the loan and subsequently seek redemption to recoup any improper charges.

Moreover, Fishman's representations that "MTAG had provided Challenger 60 with a forbearance" and that the note "would be for sale 'at par'" on April 1, 2022, were not misrepresentations. MTAG and Challenger 60 had entered into the Third Forbearance Agreement on February 1, 2022, which created a "forbearance termination date" of March 31, 2022. It is also apparent from the Subordination Agreement that "at par" referred to the amount due and owing on the loan, not only the principal. Fishman did not tell Gated it would be able to purchase the loan for the principal amount, and, even if he had, Fishman represented MTAG, not plaintiff.

Zee Bridge argues plaintiff's predecessors-in-interest failed to notify Gated of Challenger 60's default. Because Zee Bridge makes the argument for the first time in its reply brief, we decline to consider it. See Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 527 n.5 (App. Div. 2009) ("[A] new issue cannot be raised in a reply brief."). Zee Bridge also failed to make the argument in the trial court, and we decline to consider questions or issues not properly presented to the trial court when the opportunity to do so is available. See Nieder, 62 N.J. at 234.

Invoking the doctrine of unclean hands, Zee Bridge maintains it was unfair for the judge to award plaintiff interest because of plaintiff's and Challenger 60's

"grossly inequitable and fraudulent conduct."  In support, Zee Bridge cites the same allegedly fraudulent conduct relied on in its argument concerning the implied covenant of good faith and fair dealing.

"A party who resorts to equity to foreclose a mortgage exposes himself [or herself] to the operation of equitable principles and must submit to an equitable resolution of the issues raised."  Leisure Tech.-Ne., Inc. v. Klingbeil Holding Co., 137 N.J. Super. 353, 356 (App. Div. 1975).  As such, "[t]he defense of unclean hands is cognizable in a foreclosure action."  Ibid.  The doctrine provides that "a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit."  Faustin v. Lewis, 85 N.J. 507, 511 (1981).  Application of the doctrine is "limited and [it] should be used sparingly."  Hageman v. 28 Glen Park Assoc., L.L.C., 402 N.J. Super. 43, 55 (Ch. Div. 2008).

In determining whether to apply the doctrine, courts consider the totality of the circumstances and the relative equities of the parties.  Warrender v. Warrender, 79 N.J. Super. 114, 121 (App. Div. 1963).  In the foreclosure context, "[i]t is the effect of the inequitable conduct on the total transaction which is determinative of whether the maxim of unclean hands shall or shall not

33

be applied." Heritage Bank, N.A. v. Ruh, 191 N.J. Super. 53, 71 (Ch. Div. 1983) (citing Untermann v. Untermann, 19 N.J. 507, 518 (1955)).

Contrary to Zee Bridge's assertion, plaintiff's conduct does not justify application of the doctrine. Most of the unscrupulous conduct Zee Bridge complains about is either directly attributable to Selevan, rather than plaintiff, or cannot be imputed to plaintiff at all. These instances include Selevan refusing to comply with a subpoena sent by Gated, Selevan declining to send SAM the closing statement for plaintiff's purchase of the loan to avoid Zee Bridge discovering it through subpoena, and Selevan encouraging a "mercenary" strategy with plaintiff's offer of sale to Gated.

The last instance is not indicative of fraud, but hardball tactics. Selevan wanted to word the offer email in such a way as to dissuade Gated from exercising its purchase option and to sell its interest at a loss. The other two instances that are more indicative of bad faith cannot be imputed to plaintiff. Nonetheless, Zee Bridge attempts to do so through a theory of apparent authority. See Heake v. Atl. Cas. Ins. Co., 15 N.J. 475, 482 (1954) (noting that an agent's misconduct can be imputed to the principal).

"Questions of apparent authority are questions of fact and are therefore for the [factfinder] to determine." Shadel v. Shell Oil Co., 195 N.J. Super. 311,

315 (Law Div. 1984) (quoting Gizzi v. Texaco, Inc., 437 F.2d 308, 309 (3d Cir. 1971)). "The party seeking to rely on the apparent authority of a putative agent bears the burden of proof." Gayles, 468 N.J. Super. at 24.

To satisfy this burden, a party must show:

> (1) that the appearance of authority has been created by the conduct of the alleged principal and it cannot be established "alone and solely by proof of [conduct by] the supposed agent," (2) that a third party has relied on the agent's apparent authority to act for a principal, and (3) that the reliance was reasonable under the circumstances.
>
> [Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 318 (App. Div. 1999) (citations omitted) (quoting Blaisdell Lumber Co. v. Horton, 242 N.J. Super. 98, 103 (App. Div. 1990)).]

"Apparent authority focuses on a third party's reasonable expectations in their interactions with the principal's agent," and courts should "not focus on the alleged agent's actions[] but must look to the conduct of the alleged principal." Checchio v. Evermore Fitness, LLC, 471 N.J. Super. 1, 7 (App. Div. 2022).

Viewing Selevan's and plaintiff's actions through Gated's eyes, there is no credible evidence of apparent authority. The only interaction between Selevan and Gated where Selevan appeared to be acting on behalf of plaintiff was the April 11, 2022 offer of sale emailed to Gated's counsel. Critically, plaintiff was represented by the law firm of Akerman LLP (Akerman) in connection with the

foreclosure action. The only parties on the email other than Selevan and counsel for Gated were two attorneys from Akerman. In the correspondence, Selevan conveyed that "[plaintiff] ha[d] acquired the first mortgage debt" and informed Gated of the loan payoff amount as well as the terms and conditions of the offer. Selevan also instructed Gated to "respond to both legal counsel(s) of record (cc attached) to this email and all future correspondence that [Selevan] and [Gated's counsel] have directly." Selevan signed the email as Chief Executive Officer of Chesterfield.

Gated could not have reasonably believed from this email that Selevan had apparent authority to act on plaintiff's behalf. Plaintiff did nothing to indicate to Gated that Selevan had individual authority other than to acquiesce to him sending the email. However, mere acquiescence without a course of dealing between parties is insufficient to establish an agency relationship. See Blaisdell Lumber Co., 242 N.J. Super. at 103 ("There had been no prior course of dealing between the parties such as to entitle plaintiff reasonably to presume [the would-be agent's] authority to use [the principal's] credit card on his own signature."). In sum, we are satisfied the judge properly declined to apply the doctrine of unclean hands to Zee Bridge's claims of fraud on a theory of apparent authority or otherwise. Given the sophistication of the parties, their

36

representation by counsel, the infrequent application of the doctrine, and our deferential standard of review, we discern no basis to conclude the judge abused his discretion.

Lastly, Zee Bridge contends "contractual provisions calling for a higher rate of interest following default . . . are only enforceable if the . . . rate is reasonable under the totality of the circumstances," citing Metlife Cap. Fin. Corp., 159 N.J. at 495. Thus, Zee Bridge requests this court to "limit [plaintiff's] recovery to the true payoff [amount] . . . plus any taxes paid to date on the Property," or, alternatively, "instruct the trial court to conduct an evidentiary hearing as to whether any interest . . . would be reasonable" given plaintiff's misrepresentations.

"Default interest rates" are a form of stipulated damages caused by a borrower's default and are "presumptively reasonable" when applied to "commercial contract[s] between sophisticated parties." Metlife Cap. Fin. Corp., 159 N.J. at 496, 501. "[T]he party challenging the clause bears the burden of proving its unreasonableness." Id. at 496. New Jersey courts have invalidated default interest rate provisions "if their size suggests a punitive intent." Id. at 501 (finding a 3% increase was "a reasonable estimate of the potential costs of administering a defaulted loan").

"Treating reasonableness 'as the touchstone,' . . . the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the validity of a stipulated damages clause." Id. at 495 (citing Wasserman's, Inc. v. Twp. of Middletown, 137 N.J. 238, 250-54 (1994)). Whether the parties are represented by counsel and whether the provision represents an industry standard are also relevant considerations. Id. at 500. However, none of these factors are dispositive, and the determination of reasonableness is left "to the sound discretion of the trial court." Id. at 495 (quoting Wasserman's, Inc., 137 N.J. at 258).

Considering these factors, we are satisfied the judge's award of interest at the Default Rate was not an abuse of discretion. The unscrupulous conduct of which Zee Bridge complains occurred after the creation of the original loan documents and the Subordination Agreement in late 2020 and is thus irrelevant to assess the reasonableness of the default interest provision. Zee Bridge provides no authority to support its proposition that questionable conduct by a senior interest holder toward a junior interest holder invalidates the underlying default interest provision of a loan agreement.

Further, there is no evidence that Challenger 60 or Gated were coerced into signing the original loan documents or the Subordination Agreement. All

38

relevant parties to the litigation are sophisticated business entities that were represented by counsel. Although the case law suggests that an 8.5% increase in rate of interest verges on unreasonable, see Metlife Cap. Fin. Corp., 159 N.J. at 501 (citing Spiotta v. William H. Wilson, Inc., 72 N.J. Super. 572, 579 (App. Div. 1962)), the competent evidence in the record indicates the default interest rate is the industry standard for a short-term commercial loan. Accordingly, the judge did not err in finding the default interest provision reasonable and awarding plaintiff interest due under the loan documents.[4]

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

---

[4] Because Zee Bridge does not challenge the calculation of the default interest owed, we need not address whether the judge correctly computed the amount of default interest.

A-0441-24